TOWN & COUNTRY MOTORS, INC., v.
LOCAL UNION NO. 328.

1. LABOR RELATIONS—PICKETING—FINDINGS.

Picketing, conducted by defendant union at plaintiff's place of business in order to persuade plaintiff's employees to join union *held*, peaceful in suit to enjoin picketing and interference with business operations.

2. SAME—NATIONAL LABOR RELATIONS BOARD—COMMERCE.

The national labor relations act grants to the national labor relations board power over labor relations matters "affecting commerce," as such term is defined by the act (29 USCA, §§ 141–187).

3. SAME—NATIONAL LABOR RELATIONS BOARD—JURISDICTION.

The jurisdiction of the national labor relations board is not to be tested by whether or not articles flow in the direct stream of interstate commerce, upon the size of the business involved or the volume of its trade, but the board was intended to

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 31 Am Jur, Labor § 446.
Legality of, and injunction against, peaceful picketing to force employees to join union in absence of dispute between employer and employees as to terms or conditions of employment. 11 ALR2d 1338.
[2] 31 Am Jur, Labor § 190.
[2–4, 13] Construction and application of national labor relations act as to jurisdiction, powers, et cetera, of labor board. 123 ALR 612, 627.
[3, 4, 13] 31 Am Jur, Labor § 211.
[5, 14] 31 Am Jur, Labor § 572.
State court's power to enjoin picketing as affected by labor management relations act. 32 ALR2d 1026.
[7, 15] 12 Am Jur, Contempt § 40 *et seq.*
[8] 31 Am Jur, Labor §§ 4, 5.
[9] 31 Am Jur, Labor § 514.
[10] 31 Am Jur, Labor § 426.
[11] 11 Am Jur, Constitutional Law § 319.
[12] 31 Am Jur, Labor §§ 324, 325.

prevent or control unfair labor practices which provoked or
tended to provoke strikes and labor disturbances affecting
interstate commerce (29 USCA, §§ 141–187).

4. Same—National Labor Relations Board—Jurisdiction.
    The national labor relations board has jurisdiction over a retail
    automobile sales agency, operating as a part of the manu-
    facturer's national distribution system under a direct franchise
    from the manufacturer and subject to its minute inspection
    and comprehensive control, where the agency's repeated unfair
    labor practices tended to lead to disputes burdening or ob-
    structing interstate commerce (29 USCA, §§ 141–187).

5. Same—State Courts—Injunction—Jurisdiction.
    A State court is without power to deal with charges of unfair
    labor practices by way of injunction at the request of em-
    ployer which is subject to the jurisdiction of the national
    labor relations board, in the absence of a cession of jurisdiction
    to a State agency, even when the board declines to take
    jurisdiction over such employer for failure to meet certain
    standards based on dollar volume of interstate business (29
    USCA, §§ 141–187).

6. Courts—Due Process—Jurisdiction.
    A State court cannot be held to deprive a litigant of due process
    if such court has no jurisdiction to render any process what-
    soever.

7. Contempt—Jurisdiction of Court.
    One may not be held in contempt for disobedience of an order
    or command which the court had no jurisdiction to make.

8. Words and Phrases—Free Competition.
    The term "free competition" applies to all conflicts of temporal
    interests, including the competition between employers and
    the employed.

9. Labor Relations—Breaches of the Peace—Peaceful Picket-
    ing.
    Breaches of the peace may be redressed through criminal prose-
    cution and civil action for damages but peaceful picketing of
    an employer subject to the national labor relations act is
    a matter for relief, if any, through the national labor relations
    board.

10. Same—Freedom of Speech—Economic Compulsion.
    The denial to labor, in the pursuit of its legitimate objectives,
    of freedom to acquaint the public at large of its side of

the controversy with an employer is no less a denial of free speech because the notification may also exert an economic compulsion.

11. CONSTITUTIONAL LAW—FREEDOM OF SPEECH.

The essence of freedom to speak is the freedom to speak while speech may yet be effective.

12. LABOR RELATIONS—INJUNCTION—UNFAIR LABOR PRACTICES.

The 1947 amendment to the national labor relations act continued to reject the scheme of injunctive relief at the instance of employers though it imposed new limitations on the activities of unions; although the national labor relations board was empowered to seek injunctive relief against all types of unfair labor practices, acting, in such matters, in the public interest and not in vindication of purely private rights (29 USCA, § 187).

13. SAME—NATIONAL LABOR RELATIONS BOARD—JURISDICTION.

The national labor relations board has been entrusted with the uniform administration of the national labor policy and such relief as may be available must be sought from the board rather than the courts, even though had judicial relief in a State court been made available it might have been more prompt (29 USCA, § 187).

14. SAME—STATE COURTS—JURISDICTION—NATIONAL LABOR RELATIONS BOARD.

State courts are without jurisdiction, in the most elementary sense, in the field of labor relations subject to the jurisdiction of the national labor relations board.

15. CONTEMPT—STATE COURT—JURISDICTION.

Order of contempt, issued by a State court for violation of an injunction which such court then had no jurisdiction to issue, is void (29 USCA, § 160[a]).

Appeal from Delta; Jackson (Glenn W.), J. Submitted June 4, 1958. (Docket No. 14, Calendar No. 47,162.) Decided January 12, 1959.

Bill by the partnership predecessor of Town & Country Motors, Inc., a Michigan corporation, against Local Union No. 328, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and certain of

its officials, to enjoin picketing and interference with its business operations. Decree for plaintiff. Defendants appeal. Reversed and bill dismissed.

*McGinn & Fitzharris,* for plaintiff.

*Michael F. DeFant, David Previant* and *Saul Cooper (Padway, Goldberg & Previant,* of counsel), for defendants.

Smith, J. This suit is between an employer, Town & Country Motors, of Escanaba, Michigan,* and a labor organization, Local Union No. 328, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, its officers, and a labor organizer acting on its behalf. The relief sought is an order restraining the union and its agents from picketing the employer's place of business, as well as from engaging in certain related activities.

The case follows a familiar pattern of industrial warfare. The union made an unsuccessful attempt to organize the employees of Town & Country Motors. Whether this was because the employees were satisfied with their lot or whether they were discouraged from organizing by their employer, as the union charged both before the national labor relations board† and in the trial court, we need not decide. Picketing followed. The union asserted that wages, hours, and working conditions at Town & Country Motors were substandard and destructive of the union standards that had theretofore been established for its members in their employment rela-

---

* Plaintiffs at the commencement of the suit were William R. Williams and Olaf W. Peterson, partnership doing business under the name of Town & Country Motors. The suit was continued by the firm's successor, Town & Country Motors, Inc.

† Hereinafter the national labor relations board shall be referred to as NLRB.

tionships with competing concerns. The purpose of
.the picketing is controverted. The defendants con-
tend that the purpose was to inform the public and
enlist its support, and that the picketing was a con-
stitutionally protected exercise of the right of free
speech. The plaintiff contends that the purpose was
to compel it to urge and encourage its employees to
join the union, in other words, to compel it to inter-
fere with its employees' right of self-organization.
The trial court found that there were no overt acts
of violence and we conclude that the picketing was
peaceful.

A temporary restraining order was issued and con-
tempt proceedings were initiated for alleged viola-
tion thereof. Upon a hearing on the merits, the trial
court found that the purpose of the picketing was
indeed to compel Town & Country Motors to inter-
.fere with its employees' right of self-organization
and issued a permanent injunction phrased in broad
terms. The defendants contend principally that,
since the business of Town & Country Motors, an
authorized automobile dealership, is one that affects
.interstate commerce, the circuit court had no juris-
diction to hear and decide the issues presented, in
that the Congress through enactment of the national
labor relations act,* has pre-empted this area of the
law of labor relations. The defendants have taken
a general appeal to this Court, during the pendency
of which decision in the contempt proceedings is held
in abeyance.

Our first inquiry relates to the scope of jurisdic-
tion of the NLRB. The national labor relations act
grants to the NLRB power over labor relations mat-
ters "affecting commerce."† Herein, we might note,

---

* 49 Stat 449, as amended, 61 Stat 136 (29 USCA, §§ 141–187).
† National labor relations act, § 10(a), 49 Stat 453, as amended,
61 Stat 146 (29 USCA, § 160[a]).

lies the distinction between such cases as *Atlantic Coast Line R. Co.* v. *Standard Oil Company of Kentucky,* 275 US 257 (48 S Ct 107, 72 L ed 270), relied upon by appellees, in which the court was called upon to decide whether or not the movement of certain merchandise "constituted any part of interstate commerce" or "integral parts of their interstate business." This is not our issue. We are dealing with a vastly different concept, defined in the act itself:

"The term 'affecting commerce' means in commerce,* or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." 29 USCA, § 152(7).

This term, "affecting commerce," it has been held, was intended by the Congress to utilize the full extent of its powers under the commerce clause. *Polish National Alliance* v. *National Labor Relations Board,* 322 US 643 (64 S Ct 1196, 88 L ed 1509). Thus the jurisdiction of the NLRB is not to be tested by whether or not articles flow in the direct stream of interstate commerce, or, indeed, upon the size of the business involved or the volume of its trade. The act on its face, "evidences the intention of Congress to exercise whatever power is constitutionally given to it to regulate commerce by the adoption of measures for the prevention or control of certain specified acts—unfair labor practices—which provoke or tend to provoke strikes or labor disturbances affecting interstate commerce. Given the other needful conditions, commerce may be affected in the same

---

* The term "commerce" is defined (29 USCA, § 152[6]) as follows: "The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country."

manner and to the same extent in proportion to its volume, whether it be great or small." *National Labor Relations Board* v. *Fainblatt*, 306 US 601, 607 (59 S Ct 668, 83 L ed 1014). See, also, *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*, 301 US 1 (57 S Ct 615, 81 L ed 893, 108 ALR 1352).

Plaintiff Town & Country Motors holds what the union describes (without contradiction) as a "standard form" selling franchise from the General Motors Corporation. It is apparently captioned "Direct Dealer Selling Agreement for Cadillac Motor Car Division and Oldsmobile Division of General Motors Corporation." The portions before us provide in part that the dealer shall have the "nonexclusive" privilege of selling Oldsmobile motor vehicles, "parts and accessories," that he shall make detailed and periodic reports to the seller, that "each person named in paragraph third of this agreement shall devote his full time, attention and energy to the conduct of the dealership business;" that dealer's place of business, including his "salesroom, service station, parts and accessories facilities" shall not only be satisfactory to the seller, but subject to its inspection. Written consent from the seller, moreover, must be obtained in order to move to a new location, "including any used-car lot or location;" a uniform accounting system "designated by the seller" (and open to seller's examination) must be maintained by the dealer, and "in strict accordance with the accounting manual prescribed by seller;" an "advertising fund" is established from the proceeds of the sales of cars, a portion of it to be expended "in paying the cost of local advertising," another portion (the "factory" portion) to be used by the "seller for advertising of such type in such media and at such time and place as, in the opinion of seller, will most effectively serve the dealer needs or interests as determined by seller." We need not further sum-

marize the lengthy provisions before us. The supervision agreed upon is both minute and comprehensive.

The NLRB has held repeatedly that its jurisdiction extends to and comprehends retail automobile dealers operating under such agreements (whether, in particular cases, it exercises such jurisdiction or not). Thus the case of *Baxter Brothers,* 91 NLRB 1480, involved, as does this case, an employer holding a General Motors Corporation sales agreement. With respect to its jurisdiction the board held as follows (p 1481):

"Having recently re-examined board policy concerning the exercise of jurisdiction, we are of the opinion that when an employee is an integral part of a multistate enterprise, the board should exercise its discretion in favor of taking jurisdiction. We consider franchised automobile dealers, such as the respondents, to be enterprises of this nature, even though, as here, the business may be locally owned and make all its sales within the State. In reaching this conclusion, the board has considered the franchise arrangements under which the respondents operate and the fact that they function as an essential element in a nation-wide system devoted to the manufacture and distribution of automobiles. Accordingly, we find that it will effectuate the policies of the act to assert jurisdiction over the respondents."

The agreement before us, in fact, closely parallels that of *Howell Chevrolet Co.* v. *National Labor Relations Board,* 346 US 482 (74 S Ct 214, 98 L ed 215), wherein "Howell's local retail establishment was closely supervised by General Motors," with "sweeping control of the business * * * reserved by General Motors in a 'Direct Dealer Selling Agreement.'" It was there held (p 484) that "Howell was 'an integral part' of General Motors' national system

of distribution. Under these circumstances the board was justified in finding that Howell's repeated unfair labor practices tended to lead to disputes burdening or obstructing commerce among the States. It follows that the board had jurisdiction to act upon the facts it found." Such, also, was the holding in *National Labor Relations Board* v. *Bill Daniels, Inc.*, 346 US 918 (74 S Ct 305, 98 L ed 413), reversing, 202 F2d 579, involving a Michigan automobile dealer, operating under sales agreement with the Ford Motor Company, who sold "entirely within the State of Michigan, or 99% within that State, parts, accessories and motor cars purchased from Ford within the State of Michigan." In the case before us we finally note, also, with respect to the business done, that purchases by plaintiffs from outside the State amount to over $246,000, a figure hardly so insignificant as to come within the interstate *de minimas* doctrine. *National Labor Relations Board* v. *Stoller* (CCA), 207 F2d 305, 307, certiorari denied, 347 US 919 (74 S Ct 517, 98 L ed 1074), and rehearing denied, 347 US 958 (74 S Ct 675, 98 L ed 1102, 1103).

Here, as in *Howell Chevrolet* and *Bill Daniels, supra,* it is clear that the NLRB "had jurisdiction to act." But despite its plenary power over labor relations affecting interstate commerce, the board from the start, has declined to exercise such jurisdiction in certain cases coming before it. Such screening has been accomplished through the application of certain standards.[*] Whether such standards have been reached in the case before us is a question the parties approach in a gingerly manner, leading us to suspect that they are not quite sure. The appellee contents itself with the assertion that

---

[*] For general 1950 standards see 15 NLRB Ann Rep 5–7; the NLRB's Revised Jurisdictional Standards released to the press on July 15, 1954, are found in 19 NLRB Ann Rep 2–5.

"plaintiff was engaged in intrastate commerce." To the defendants "it seems that the NLRB would decline to exercise its jurisdiction" because of the 1954 jurisdictional yardsticks promulgated by the NLRB. It adds that "only this month, however, NLRB chairman, Mr. Boyd Leedom, testified before a house labor subcommittee that the NLRB may revise its standards.  *  *  *  Hence, whether NLRB would or would not exercise jurisdiction in the circumstances of this case is at present an open question." Defendants further state that "the opinion of the trial court sets forth the 1954 jurisdictional standards insofar as those standards relate to establishments such as Town & Country Motors." The "direct inflow standard" there referred to requires "an enterprise which receives goods or material, from out of the State, valued at $500,000 or more." As to this standard the trial court held that, as a conceivable maximum, "the combined totals of the out of State inflow and the inflow over the Straits of Mackinac amounts to $423,859.39, which is far below the new standards promulgated." As to the outflow standard the trial court found that "the total of these amounts is $26,443.86, being considerably less than the minimum standards promulgated."

Not only, then, did the trial court find that there was a failure to reach the NLRB's jurisdictional standards but such, also, was the opinion of the field examiner of the regional office of the NLRB. The union, by its Mr. Arnold Alsten, secretary-treasurer of Local 328, had filed a charge with the NLRB that Town & Country was and had been engaged in unfair labor practices. With respect thereto the following letter appears in the record, addressed to plaintiff's counsel:

"Re : Town & Country Motors
Case No. 18–CA–742

*"Dear Sir* :

"This will confirm our conversation of today in which I advised you that our investigation has shown that the Town & Country Motors at Escanaba, Michigan, would not be accepted by the National Labor Relations Board as being within its jurisdiction.

"As you know, this decision is based upon the signed information given us on April 24, 1956 to the effect that approximately $20,000 of the copartnership sales were made to persons outside of the State of Michigan and that its purchases were less than $500,000, of which none were made from points outside of Michigan. The current standards of the Board require that 'a company operating a single retail store or service establishment only' must make annual sales directly out of State of at least $100,000 in value and/or make annual purchases directly from out of State of at least $1,000,000 in value or make annual purchases indirectly from out of State of at least $2,000,000 in value.

"This information has been given to the union involved in this case with the statement that if not withdrawn, it will be necessary that I recommend that the charge be dismissed by the regional director. This action would be taken next week except for the fact that I shall be in Michigan and unable to take any action.

"The recommendation will therefore be made as soon after May 14, 1956 as time will permit.

"We are inclosing herewith a copy of the Nineteenth Annual Report of the National Labor Relations Board for the fiscal year ended June 30, 1954, on page 4 of which, under paragraph 4, you will find the information cited above.

"Very truly yours,
"RAY C. JENKINS,
"Enclosure      "Field Examiner."

A portion of the 1954 jurisdictional standards of the NLRB we quote in the margin hereof.*

---

\* "We have determined that in future cases the board will assert jurisdiction—

"1. [General Standards for Other-Than-Retail Establishments:] over enterprises which annually meet one or more of the following standards:

"(1) *Direct inflow standard*:

"An enterprise which receives goods or materials from out of State, valued at $500,000 or more.

"(2) *Direct outflow standard*:

"An enterprise which produces or handles goods and ships such goods out of State, or performs services outside the State in which the enterprise is located, valued at $50,000 or more.

"The enterprise itself must actually ship the goods to the out-of-State destination.

"(3) *Indirect inflow standard*:

"An enterprise which receives goods or materials from other enterprises in the same State which those other enterprises received from out of State, valued at $1,000,000 or more.

"However, the goods must be received by the ultimate purchaser in the form in which they entered the State.

"(4) *Indirect outflow standard*:

"An enterprise which furnishes goods or services to other enterprises coming within subparagraph (2), above, or to public utilities or transit systems, or instrumentalities or channels of commerce and their essential links, which meet the jurisdictional standards established for such enterprises; *and*

"(a) Such goods or services are directly utilized in the products, services, or processes of such enterprises and are valued at $100,000 or more; *or*

"(b) Such goods or services, regardless of their use, are valued at $200,000 or more.

"(5) *Multistate standard*:

"An establishment other than retail which is operated as an integral part of a multistate enterprise; *and*

"(a) The particular establishment involved meets any of the foregoing standards; *or*

"(b) The direct outflow of the entire enterprise amounts to $250,000 or more; *or*

"(c) The indirect outflow of the entire enterprise amounts to $1,000,000 or more.

"We have further determined that unless an employer's volume of operations meets one of the board's new independent jurisdictional standards, we will not accumulate those standards in order to assert jurisdiction.

"However, direct and indirect inflow may be added in applying the indirect inflow standard.

"2. [Intrastate Links of Interstate Commerce:] over transportation operations or other local activities which constitute a link in the chain of interstate commerce only where the annual income received

We do not, however, pass upon the correctness of the application of the standards to the case at bar, either by the trial court or the regional office of the NLRB. Nor do we pass upon the question of whether or not the NLRB would or would not ultimately have assumed jurisdiction had the matter been pursued through the various administrative channels to a final ruling thereon. We do not pass upon these matters because they are not essential to decision. We have concluded heretofore that the business of Town & Country came within the jurisdiction of NLRB. *Howell Chevrolet Co.* v. *National Labor Relations Board, supra; National Labor Relations Board* v. *Bill Daniels, Inc., supra.* This being the case, the matter is squarely ruled by *Guss* v. *Utah Labor Relations Board,* 353 US 1 (77 S Ct 598, 1 L ed 2d 601); and its companion cases, *San Diego Building Trades Council* v. *Garmon,* 353 US 26 (77 S Ct 607, 1 L ed2d 618); and *Amalgamated Meat Cutters* v. *Fairlawn Meats, Inc.,* 353 US 20 (77 S Ct 604, 1 L ed 2d 613). (The last case involved, as does the case before us, an action by an employer for an injunction against union picketing of its premises. Prior to picketing, the union had unsuccessfully attempted to organize the plaintiff's employees. No petition had been filed with the NLRB.)

The issue settled in these cases, so far as it affects our present decision, had been before the courts, the

---

by the particular company involved from services which constitute a part of interstate commerce totals no less than $100,000.

"It was further announced that jurisdiction will be asserted over (1) intrastate transit companies receiving at least $100,000 annually as a link in interstate transportation of passengers; and (2) over transit companies operating partly or wholly interstate and deriving at least $100,000 annually from (a) interstate operations or (b) from combined intrastate link transportation of passengers and interstate operations."

In addition, standards were published for some 12 additional categories (*e.g.,* concerns doing national defense business, retailing concerns, multistate retail chains, franchised dealers, office buildings, et cetera).

NLRB, and the Congress for years, and had produced a torrent of discussion.* With respect to the assumption of jurisdiction by the State courts in the event the NLRB failed or refused to exercise jurisdiction, it was argued, on the one hand, that failure so to do would result in a no-man's land situation where both employee and employer would be without remedy as to a great number of unfair labor practices. This is a situation that cannot be viewed with equanimity or detachment by any citizen of an industrial State. (Violence, of course, always remains controllable by the local authorities. See *Hill* v. *Florida, ex rel. Watson,* 325 US 538, 544 [65 S Ct 1373, 89 L ed 1782].) Per contra, it was argued that the assumption by the State courts of jurisdiction would result in a hodge-podge of regulation in a field wherein uniformity of regulation was the congressional intent, opening the door to competition between States for business on the inducement of "favorable" labor laws, just as we have States with "favorable" divorce laws and "favorable" corporation laws. Conflicting authority would, moreover, be commonplace within the States themselves, not only as to individual employers (who in lean years might fall short of the NLRB dollar standards, and thus be subject to State control, while in the harvest years might exceed such standards and be subject to Federal control), but also as between neighboring employers, one company being under the standards and subject to State jurisdiction, its neighbor being over the standards and subject to NLRB jurisdiction, with obvious effects upon their relative competitive positions. The jurisdiction of the State

* Leading analyses are Tobriner and Grodin, Taft-Hartley Preemption in the Area of NLRB Inaction, 44 Cal L Rev 663; Smith, The Taft-Hartley Act and State Jurisdiction over Labor Relations, 46 Mich L Rev 593; Note, New Entrance into "No-Man's-Land," 65 Yale LJ 86.

courts would first have to be established with reference to the NLRB's jurisdictional standards, a task the magnitude of which we have hinted heretofore, involving the interpretation of complicated standards of uncertain application, the accuracy of such determination in each case presenting a Federal question. Our jurisdiction would, moreover, wax and wane with the NLRB's amendments and interpretations of its jurisdictional standards. These and similar considerations with respect to the interpretation and administration of an act national in its scope give point to the repeated holdings by the United States supreme court to the effect that "the board, and not the State court, is empowered to pass upon such issues in the first instance." *Weber* v. *Anheuser-Busch, Inc.*, 348 US 468, 478 (75 S Ct 480, 99 L ed 546). See, also, *Teamsters Union* v. *New York N. H. & H. R. Co.*, 350 US 155, 161 (76 S Ct 227, 100 L ed 166), wherein it was held:

"Respondent contends, however, that even if railroads may seek the aid of the NLRB, it was not required to do so in this case because petitioners' conduct was neither protected by section 7 nor prohibited by section 8(b)(4) of the labor management relations act.* As we noted earlier, respondent's amended complaint alleged violations of the act. Whether the act was violated or whether, as respondent now claims, it was not, is, of course, a question for the board to determine."

That a choice between such powerful and competing considerations would eventually have to be made has been obvious for years. Under the commerce and supremacy clauses of the Constitution† the choice is that of the Congress and the history of the governing legislation discloses that it was de-

---

* 29 USCA, §§ 157, 158(b)(4).—REPORTER.

† See *Gibbons* v. *Ogden* (1824), 22 US (9 Wheat) 1 (6 L ed 23).

liberately made by the Congress.  This is made
clear in *Amalgamated Association of Street Rail-
way Employees* v. *Wisconsin Employment Relations
Board,* 340 US 383, 397, 398 (71 S Ct 359, 95 L ed
364, 22 ALR2d 874), in which it was held (the foot-
notes are those of the United States court):

"When it amended the Federal act in 1947, Con-
gress was not only cognizant of the policy questions
that have been argued before us in these cases, but
it was also well aware of the problems in balancing
State-Federal relationships which its 1935 legisla-
tion had raised.  The legislative history of the 1947
act refers to the decision of this court in *Bethlehem
Steel Co.* v. *New York Labor Board* (1947), 330 US
767 (67 S Ct 1026, 91 L ed 1234), and, in its handling
of the problems presented by that case, Congress
demonstrated that it knew how to cede jurisdiction
to the States.[23]  Congress knew full well that its
labor legislation 'preempts the field that the act
covers insofar as commerce within the meaning of
the act is concerned'[24] and demonstrated its ability
to spell out with particularity those areas in which
it desired State regulation to be operative.[25]  This
court, in the exercise of its judicial function, must
take the comprehensive and valid Federal legisla-
tion as enacted and declare invalid State regulation
which impinges on that legislation."

---

"[23] Section 10(a) of the 1947 Act, 29 USC (Supp III), § 160(a).
A proviso of section 10(a) authorizes cession of jurisdiction to the
States only where the State law is consistent with the Federal leg-
islation.   This insures that the national labor policy will not be
thwarted even in the predominantly local enterprises to which the
proviso applies.  S Rep No 105, 80th Cong., 1st Sess 26 (1947).
See, also, minority views to same report, *id.*, pt 2, 38, agreeing as to
this feature of the legislation.

"[24] HR Rep No. 245, 80th Cong., 1st Sess. 44 (1947).

"[25] See sections 8(d), 14(b), 202(c) and 203(b), 29 USC (Supp.
III), §§ 158(d), 164(b), 172(c), and 173(b), in addition to section
10(a) of the 1947 act for examples of congressional direction as to
the role that States were to play in the area of labor regulation
covered by the Federal act.  And sections 2(2) and 2(3) of the
Federal act, 29 USC (Supp III), §§ 152(2), 152(3), specifically
exclude from its operation the employees of 'any State or political
subdivision thereof.' "

In other words, the problems we have described were clearly visible to the Congress at the time of the *Bethlehem Steel Case, supra.* It met them by the enactment of section 10(a), above referred to, authorizing a cession of NLRB's jurisdiction to the States upon certain conditions. It would seem clear beyond argument that no statutory provision for the ceding of jurisdiction would have been necessary had the national act not extended its coverage to the full limit of the constitutional power involved.

Against this legislative, economic, and judicial background the sweep and importance of the decisions in the *Guss, Amalgamated Meat Cutters,* and *Garmon Cases, supra,* and their control over our permissible areas of action, become clear. As was said in *Guss, supra* (pp 9–12):

"We hold that the proviso to section 10(a) is the exclusive means whereby States may be enabled to act concerning the matters which Congress has entrusted to the national labor relations board. * * *

"We are told by appellee that to deny the State jurisdiction here will create a vast no-man's-land, subject to regulation by no agency or court. We are told by appellant that to grant jurisdiction would produce confusion and conflicts with Federal policy. Unfortunately, both may be right. We believe, however, that Congress has expressed its judgment in favor of uniformity. Since Congress' power in the area of commerce among the States is plenary, its judgment must be respected whatever policy objections there may be to creation of a no-man's-land.

"Congress is free to change the situation at will. In 1954 the senate committee on labor and public welfare recognized the existence of a no-man's-land and proposed an amendment which would have empowered State courts and agencies to act upon the national board's declination of jurisdiction.[16] The

"16 'The effect * * * of the board's policy of refusing to assert its jurisdiction has been to create a legal vacuum or no-man's-land

national labor relations board can greatly reduce
the area of the no-man's-land by reasserting its juris-
diction and, where States have brought their labor
laws into conformity with Federal policy, by ceding
jurisdiction under section 10(a).[17]  The testimony
given by the chairman of the board before the ap-
propriations committees shortly before the 1954 re-
visions of the jurisdictional standards indicates that
its reasons for making that change were not basicly
budgetary.  They had more to do with the board's
concept of the class of cases to which it should devote
its attention."[18]   (Footnotes are the United States
court's.)

Any other conclusion would, of course, permit the
NLRB to do indirectly what it could not accomplish
directly, namely, to cede jurisdiction to a State the
law of which was inconsistent with the Federal law.
See 56 Mich L Rev 133 (1957).

The following should also be observed from the
*Amalgamated Meat Cutters Case, supra* (pp 23, 24):

"Although the extent of respondent's interstate
activity seems greater even than that in *Building
Trades Council* v. *Kinard Construction Co.*, 346 US
933 (74 S Ct 373, 98 L ed 423), we will assume that

with respect to cases over which the board, in its discretion, has
refused to assert jurisdiction.  In these cases the situation seems
to be that the board will not assert jurisdiction, the States are
forbidden to do so, and the injured parties are deprived of any
forum in which to seek relief.'  S Rep No 1211, 83d Cong, 2d Sess
18.   The minority agreed that 'When the Federal board refuses to
take a case within its jurisdiction, the State agencies or courts are
nevertheless without power to take jurisdiction, since the dispute
is covered by the Federal act, even though the Federal board declines
to apply the act.  There is thus a hiatus—a no-man's-land—in which
the Federal board declines to exercise its jurisdiction and the State
agencies and courts have no jurisdiction.'  *Id.*, Pt 2, p 14.   The
committee's bill, S 2650, was recommitted.   100 Cong Rec 6203."

"17 The national labor relations board has informed us in its
brief *amicus curiae* in these cases that it has been unable, because of
the conditions prescribed by the proviso to section 10(a), to con-
summate any cession agreements.

"18 Hearings before subcommittee of house committee on appropri-
ations, department of labor and related independent agencies, 83d
Cong, 2d Sess 309, 315, 323."

this is a case where it was obvious that the board would decline jurisdiction.

"On this view of the case, our decision in *Guss* v. *Utah Labor Relations Board, ante,* p 1, controls. If the proviso to section 10(a) of the national labor relations act operates to exclude State labor boards from disputes within the national board's jurisdiction in the absence of a cession agreement, it must also exclude State courts. See *Garner* v. *Teamsters Union,* 346 US 485, 491 (74 S Ct 161, 98 L ed 228). The conduct here restrained—an effort by a union not representing a majority of his employees to compel an employer to agree to a union shop contract—is conduct of which the national act has taken hold. Section 8(b)(2), 61 Stat 141, 29 USC, § 158 (b)(2). *Garner* v. *Teamsters Union, supra,* teaches that in such circumstances a State cannot afford a remedy parallel to that provided by the act.

"It is urged in this case and its companions, however, that State action should be permitted within the area of commerce which the national board has elected not to enter when such action is consistent with the policy of the national act. We stated our belief in *Guss* v. *Utah Labor Relations Board, ante,* at pp 10, 11, that 'Congress has expressed its judgment in favor of uniformity.' We add that Congress did not leave it to State labor agencies, to State courts or to this court to decide how consistent with Federal policy State law must be. The power to make that decision in the first instance was given to the national labor relations board, guided by the language of the proviso to section 10(a). This case is an excellent example of one of the reasons why, it may be, Congress was specific in its requirement of uniformity. Petitioners here contend that respondent was guilty of what would be unfair labor practices under the national act and that the outcome of proceedings before the national board would, for that reason, have been entirely different from the outcome of the proceedings in the State courts. Without expressing any opinion as to whether the

record bears out its factual contention, we note that the opinion of the Ohio court of appeals takes no account of the alleged unfair labor practice activity of the employer. Thus, it cannot be said with certainty whether the State court's decree is consistent with the national act."

The last paragraph of the quotation is of peculiar applicability to the matter before us. It requires no more than a superficial study of the legislative history of the Taft-Hartley act (61 Stat 136, 29 USCA, §§ 141–187) to observe the congressional rejection of the theory that employers should be permitted to do precisely what was here done, namely, to apply directly to the courts for injunctive relief against strikes and peaceful picketing for objectives which the act denominated unfair labor practices. As Senator Ives put it (93 Cong Rec 4839; 2 NLRB, Legislative History, Labor Management Relations Act, p 1356), allowance of such course of action would only serve to reintroduce "the flagrant abuses which brought about the enactment of the Norris-LaGuardia act."

Lacking State action pursuant to section 10(a) of the act, providing the manner whereby the States may acquire jurisdiction, we are without power or jurisdiction to deal with unfair labor charges within the jurisdiction of the NLRB. *Guss, Amalgamated Meat Cutters,* and *Garmon, supra.*

Appellee discusses at some length the argument that due process requires that it, a State court, take jurisdiction of cases wherein jurisdiction is denied, or not asserted, by the NLRB, stating that "The question of due process was not mentioned by the United States supreme court in the *Guss Case, supra,* and its 2 companion cases." The argument, however, has repeatedly been brought to the attention of the supreme court. It was discussed extensively by the employer in the *Fairlawn (Meat Cutters) Case,*

*supra,* and the motion for rehearing, which was denied (353 US 948, 77 S Ct 822, 1 L ed2d 857), was based solely upon it. It was made and rejected in *Ex parte Twedell,* 158 Tex — (309 SW2d 834); and in *Hehl* v. *Chippewa & Red Cedar Valley Carpenters' District Council,* 4 Wis2d 629 (91 NW2d 226). The answer is clear: We have no jurisdiction in the premises. We cannot be held to deprive a litigant of *due* process if we have no jurisdiction to render any process whatsoever. We cannot give a man a day in court if, for his purposes, we do not have the jurisdiction required by a court. Moreover, a proper observance of the respective limits of the Federal-State system impels us to decline the heady invitation that we declare to be unconstitutional decisions of the United States supreme court.

It remains to consider the disposition of the petition for contempt. This issue arose out of the following: Peaceful picketing had commenced on March 21, 1956, and continued until April 5, 1956. Upon this date a temporary restraining order was issued, it reciting that "on reading and filing the bill of complaint in this cause and on motion of McGinn and Fitzharris, counsel for plaintiff, it is ordered that the above-named defendants" show cause upon a day certain why injunction should not issue during the pendency of the suit, and that "in the meantime" said defendants were ordered to "desist and refrain from picketing the plant and place of business of plaintiffs" and from other named acts, some of which, as may be observed in the footnote,* were

---

* The operative paragraph of the order of restraint read as follows: "And it is further ordered that in the meantime and until the further order of the court, the said defendants Local Union No. 328, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, LeRoy Pettit, individually, and as an officer of said union, Arnold Alsten, individually, and as an officer and business representative of said union, Lial Clausohm, individually, and as an organizer of said union, together with all of the officers and members of said local union, and each of them,

defined in the broadest possible terms.   What happened thereafter is in dispute.   Appellee asserts that—

"after the summons, bill of complain and restraining order had been served on defendants, the defendants stopped picketing during the morning of April 6, 1956, and then recommenced picketing on the afternoon of April 6th and continued picketing until an order to show cause why defendants and respondents Wallace Gasman and Raymond Gangstad should not be held in contempt of court was served.   Service was had during the evening of April 7th."

---

their agents, employees, servants, members, and counselors and attorneys and each and every one of them, do absolutely desist and refrain from picketing the plant and place of business of plaintiffs; engaging in or inducing, encouraging the employees of any employer to engage in a concerted refusal in the course of their employment to use, transport or otherwise handle or work on any goods, articles, materials or commodities or to perform any services for the purposes of preventing the delivery of such goods, articles, materials or commodities, to and from the plaintiffs and their place of business; inducing or encouraging employers other than plaintiffs to engage in a concerted refusal to deliver or to cause their employees not to deliver supplies and goods, articles, materials and commodities to and from the plaintiffs and their place of business; threatening or ordering boycotting against persons supplying goods, articles, materials and commodities to plaintiffs and their place of business or making deliveries of goods, articles, materials and commodities to or from the plaintiffs and their place of business or purchasing goods, articles, materials, commodities, automobiles or services from plaintiffs or selling goods, articles, materials, commodities, automobiles and services to plaintiffs; interfering with the servants, employees or agents of the plaintiffs or coercing them in any manner from carrying out the ordinary course of plaintiffs' business, including going to and from plaintiffs' place of business, the transportation of plaintiffs' products, automobiles, articles, goods, materials and commodities or the sale thereof or the delivery thereof to plaintiffs' customers; from coercing and attempting to force and coerce plaintiffs to require their employees to join Local Union No. 328 or to force or coerce or attempt to force or coerce said employees to join said union or to force and coerce plaintiffs to enter into a contract with said union; recognizing said union as bargaining agent for said employees, contrary to their will; threatening or ordering boycotts against persons doing business or wishing to do business with plaintiffs and their place of business and threatening to prevent or preventing employees of plaintiffs from obtaining employment at their trades as a means of forcing employees of plaintiffs to join Local Union No. 328 against their will, until the further order of this court."

Appellants, on the other hand, state that—

"It is pertinent to note that the trial court made no finding that the union continued picketing in violation of the *ex parte* restraining order. The testimony adduced in the course of the trial demonstrates that the only conduct engaged in following service of the order was the distribution of pamphlets. Such conduct was not prohibited by the order."

The primary inquiry presented by the contempt proceedings relates to the nature of the order allegedly violated. We take as axiomatic the statement of the law made by Mr. Justice WIEST many years ago that "one may not be held in contempt for disobedience of an order or command which the court had no jurisdiction to make." (*In re Mead,* 220 Mich 480, 483.)

What, then, is the legal effect of the injunction before us? Is it in truth void? Or is it merely an erroneous order, to be obeyed until set aside? The questions, as is true in respect of all going to the jurisdiction of courts, are not without difficulty. The answer must be found, not in abstract reasoning, but in the intent of the framers of the legislation, viewed in the light of the problems pressing for solution. If this case involved no more than the exercise of the traditional discretion of the chancellor, in a case devoid of the asserted Federal pre-emption, he would be well advised to ponder the thoughtful conclusions of one of the leaders of the American Bar, the late John W. Davis, who a half century ago, placed the issuance of the *ex parte* labor injunction first in his list of the "glaring abuses which have crept into the administration of this remedy." (48 Cong Rec 6436.) The might of the chancellor, armed as he is, with the incalculable strength of the force and majesty of the law and the power of organized society itself, will be exercised only upon the dic-

tates of a conscience the most sensitive, a discretion the most exquisite, with a full awareness that his injunction, though temporary in name, will finally and conclusively dispose of the controversy before him. Mr. Justice Holmes went to the heart of the matter in his famous opinion in *Vegelahn* v. *Guntner,* 167 Mass 92, 107 (44 NE 1077, 35 LRA 722, 57 Am St Rep 443):

"I have seen the suggestion made that the conflict between employers and employed is not competition. But I venture to assume that none of my brethren would rely on that suggestion. If the policy on which our law is founded is too narrowly expressed in the term free competition, we may substitute free struggle for life. Certainly the policy is not limited to struggles between persons of the same class competing for the same end. It applies to all conflicts of temporal interests."

But this is not, as we have noted, an exercise merely of the traditional discretion of the chancellor. None of the doctrines supporting interim obedience to an injunction issued, perhaps unwisely, by a court in the exercise of its primary jurisdiction, pending its challenge in a higher court (namely, the supremacy of law over man, the principle that a court having primary jurisdiction has, also, the jurisdiction to make a mistake, the "subjection of force to reason," Pound, The Future of the Law, 47 Yale L J 1, 13), is here involved or applicable to the case before us. Here the vitiating defect lies at the very threshold of the court's assumption of power. Why?

Even a court may utilize the blessings of hindsight. A glance at the past will reveal the considerations that led to the enactment of the legislation before us, which considerations, in our opinion, preclude any interpretation of the act and its consequences other than the one we here employ. It

will have been observed that up to the time of the issuance of the injunction the controversy followed what was for years the usual practice of dealing with a labor dispute, that is, simply to enjoin the strike and thus break it. Frankfurter and Greene, in their authoritative study, The Labor Injunction, describe the results of the proceedings in the following terms (pp 200, 201):

"The history of the labor injunction in action puts some matters beyond question. In large part, dissatisfaction and resentment are caused, first, by the refusal of courts to recognize that breaches of the peace may be redressed through criminal prosecution and civil action for damages, and, second, by the expansion of a simple, judicial device to an enveloping code of prohibited conduct, absorbing, *en masse,* executive and police functions and affecting the livelihood, and even lives, of multitudes. Especially those zealous for the unimpaired prestige of our courts have observed how the administration of law by decrees which through vast and vague phases surmount law, undermines the esteem of courts upon which our reign of law depends. Not government, but 'government by injunction,' characterized by the consequences of a criminal prosecution without its safeguards, has been challenged.

"The restraining order and the preliminary injunction invoked in labor disputes reveal the most crucial points of legal maladjustment. Temporary injunctive relief without notice, or, if upon notice, relying upon dubious affidavits, serves the important function of staying defendant's conduct regardless of the ultimate justification of such restraint. The preliminary proceedings, in other words, make the issue of final relief a practical nullity. * * * The [labor] injunction cannot preserve the so-called *status quo;* the situation does not remain in equilibrium awaiting judgment upon full knowledge. The suspension of activities affects only the strikers; the employer resumes his efforts to defeat the strike,

and resumes them free from the interdicted interferences. Moreover, the suspension of strike activities, even temporarily, may defeat the strike for practical purposes and foredoom its resumption, even if the injunction is later lifted."

Prominent among the abuses was the common inclusion of injunctive language construed to forbid labor's publicizing what it regarded as the essential facts concerning the controversy by means of the placards of the picket line and the dissemination of leaflets therefrom.* Constitutional difficulties of the most serious nature (*cf., Thornhill* v. *Alabama,* 310 US 88 [60 S Ct 736, 84 L ed 1093]) cluster around the employment of a court's injunctive process in derogation of our basic freedoms. The denial to labor, in the pursuit of its legitimate objectives, of freedom to acquaint the public at large of its side of the controversy is no less a denial of free speech because the notification may, as well, exert an economic compulsion upon the listener. To say that

---

* We note that the petition for contempt in the matter before us asserts that a leaflet, reading as hereinbelow set forth, was circulated from the picket line subsequent to the service of the court's restraining order:

"PLEASE DO NOT PATRONIZE TOWN & COUNTRY MOTORS

"The sales and service agencies (garages) listed below located in Escanaba and Gladstone operate under signed collective bargaining agreements with our union. These concerns grant employees whom we represent decent wages, hours and working conditions under freely negotiated collective bargaining agreements.

"We are anxious to advertise this fact to the public and to urge the people of this community to favor our members with their business.

"We do not claim that there is anything wrong with the workmanship at the Town & Country Motors. Its employees have the right not to belong to our union, and the employer has no duty to bargain with us unless a majority of its employees join our union.

"We are asking you to refrain from patronizing this company because we want to provide more jobs and earning opportunity for our members employed at other companies under contract with our union. This will not only help our members and our union, but will also assist the cause of the AFL–CIO.

"Please patronize concerns who are under collective bargaining agreements with the teamsters union. Thank you!

"TEAMSTERS & CHAUFFEURS UNION
LOCAL No. 328"

a "temporary" order restraining the exercise of a basic constitutional right is harmless to the existence and exercise of the right because the interference is only temporary is to substitute a shabby formula for a basic freedom. With obedience to the "temporary" injunction, under pain of contempt, the basic right is lost. It is the utterance of the protest of oppression that is intended to quicken the conscience of the community. If we still the tongue at the moment of need we may as well tear it out. The word that is heeded is the word wrung out of the very crisis itself, not the murmurings of reproach after the battle is lost. The essence of the freedom to speak is the freedom to speak while speech may yet be effective.

These abuses and the attendant uncertainty of the law to be applied led to comprehensive Federal legislation, of which the national labor relations act, now before us, is a part. The legislative history of the amendment of the act in 1947 makes it clear that the congress continued to reject the scheme of injunctive relief at the instance of employers though it imposed new limitations on the activities of unions. We find in *Amazon Cotton Mill Co.* v. *Textile Workers Union of America,* 167 F2d 183, 188, 189:

"The senate report (S Rep No 105 on Senate Bill No 1126, p 8)* said that with respect to section 10(j) and 10(*l*):   *   *   *   'Hence we have provided that the *board, acting in the public interest and not in vindication of purely private rights,* may seek injunctive relief in the case of all types of unfair labor practices and that it shall also seek such relief in the case of strikes and boycotts defined as unfair labor practices.' (Italics supplied.)   *   *   *

"Senator's Ball's amendment was rejected and Senator Taft, then introduced the amendment which

---

* Senate Miscellaneous Reports, 80th Congress, 1st Sess.—REPORTER.

became section 303¹ authorizing suits for damages on account of jurisdictional strikes and secondary boycotts.   Fear was expressed by Senator Morse [Oregon] that this might give rise to the granting of injunctive relief in these cases (but not generally) to which Senator Taft replied (93 Cong Rec 5074):²

" 'Let me say in reply to the Senator or anyone else who makes the same argument, that that is not the intention of the author of the amendment.   It is not his belief as to the effect of it.   It is not the advice of counsel to the committee.   Under those circumstances I do not believe that any court would construe the amendment along the lines suggested by the Senator from Oregon.'   *   *   *

"It is interesting to note that the same interpretation has been placed upon it by Mr. Van Arkel, former general counsel of the labor board, who analyzed the act for the Practising Law Institute. He says at pp 63-64 of his analysis:

" 'The legislative history, as has been indicated passim, seems entirely clear that injunctive relief on petition of private parties is not contemplated under the act.   There is a possible exception, in that section 302(a) [29 USCA, § 186(a)], dealing with restrictions on payments to employee representatives, in section 302(e) grants power to the district courts "to restrain violations of this section" without regard to the Norris-LaGuardia act or sections 6 and 20 of the Clayton act [15 USCA, § 17, 29 USCA, § 52].   This power is clearly limited to section 302 and hence could be exercised only in the case of violations of the health and welfare and checkoff provisions of the act.' "³

It is thus clear that in providing for uniform administration of the national labor policy, although the framers of the amendment recognized that im-

---

¹ 29 USCA, § 187.—Reporter.

² Bound volume reference, 93 Cong Rec 4872.—Reporter.

³ Van Arkel, An Analysis of the Labor Management Relations Act, 1947, Practising Law Institute, New York.—Reporter.

mediate court action would often afford more prompt relief than administrative processes, they elected, nevertheless, to entrust the difficult and delicate problems involved, going to the very heart of our economic system, and the welfare of thousands of our citizens, to the NLRB.

Such, then, was the intent of the framers of the act with respect to the *ex parte* labor injunction, the alleged violation of which in the case before us, it is asserted, must now be investigated by the trial chancellor and presumably, if violated, punished, "irrespective of what action is taken [by the Supreme Court] on the question of jurisdiction over the subject matter of this cause."

The procedure urged would, as a practical matter, mean the end of the Federal pre-emption of the field and the utter nullification of clear congressional intent that there be national uniformity of treatment of this complex social and economic problem. National policy would be effectively frustrated by a diversity of opinion as to how far Federal regulation extended. If, moreover, regardless of the State court's jurisdiction, its orders are to be obeyed under pain of contempt, obedience there will be, even at the cost of the loss of the strike, as the long history of the labor injunction so eloquently attests. The restraining order temporary in name is decisive in reality. We cannot interpret the legislation before us as permitting the restoration to full vigor of the ancient evils described. The action prayed is not permissible under the controlling legislation. The board, and only the board, may obtain injunctive relief, should such be the public interest. We are led to conclude that the State courts are without jurisdiction in the most elementary sense. The order of the court being void for want of jurisdiction over the subject matter, we cannot remit to such court the fruitless task of ascertaining whether or

not certain acts of the defendants constituted a "contempt" of the void order. The holding in *Great Lakes Greyhound Lines* v. *International Union, UAW-CIO,* 341 Mich 290, is not to the contrary. We did not, in that case, find the court's order void for lack of jurisdiction. More to the point is *Amalgamated Association of Street Railway Employees* v. *Wisconsin Employment Relations Board* (1951), 340 US 383 (71 S Ct 359, 95 L ed 364, 22 ALR2d 874). There the State circuit court's *ex parte* restraining order in a strike situation was found violated and the court entered "a judgment of contempt," affirmed by the Wisconsin supreme court *(Wisconsin Employment Relations Board* v. *Milwaukee Gas Light Co.,* 258 Wis 1 (44 NW2d 547). The United States supreme court reversed. "The national labor relations act of 1935 and the labor management relations act of 1947, passed by congress pursuant to its powers under the commerce clause," held the court (p 399), "are the supreme law of the land under article 6 of the Constitution. Having found that the Wisconsin public utility anti-strike law conflicts with that Federal legislation, the judgments enforcing the Wisconsin act cannot stand." Where, then, as here, the national labor relations act pre-empts the field and exclusive jurisdiction is vested in the NLRB, both authority to enjoin within the pre-empted area and to punish for contempt of the null injunction are denied the State by the Federal act.

Three bodies have the power to remedy the basic situation presented: The congress, the NLRB,[*] and

---

[*] Defendants inform the court by letter dated October 6, 1958, that: "On Thursday, October 2d, the national labor relations board announced that the new standards were effective immediately (42 Labor Relations Reporter 633). Accordingly, it is submitted that a forum before the national labor relations board is now available for plaintiff-appellee under the labor-management relations act of 1947." Plaintiff's letter with respect thereto disputes this conclusion,

the States. None has acted. An agency of our State, of course, might have been vested with authority to act had our State seen fit to accept the solution tendered by the Congress under section 10(a).* Not having done so, not having accepted authority in the manner prescribed by the Congress, it would lie ill in our mouths to assert that our very lack of jurisdiction resulting therefrom somehow invests us with jurisdiction.

In summary, the trial court was without jurisdiction to issue the injunction since the NLRB has not completed with any agency of the State a cession of jurisdiction pursuant to section 10(a) of the labor-management relations act of 1947.

The decree of the lower court is vacated and the bill dismissed. Costs to defendants.

BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred, with SMITH, J.

CARR, J. (*concurring*). The basic question at issue in this suit in equity has reference to the jurisdiction of the trial court to hear the case and to enter a decree. Plaintiff's bill of complaint alleged that its garage business in the city of Escanaba was being

---

stating that: "As we understand the new jurisdictional standards this would mean that national labor relations board would not provide a forum for Town & Country Motors, Inc."

* The cited section provides as follows (29 USCA, § 160[a]):

"The board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided,* That the board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith."

caused to suffer irreparable injury because of unlawful conduct on the part of the defendants, said business embracing the sale of automobiles and parts therefor. Specifically it was averred that none of plaintiff's employees belonged to the union, that defendants sought to compel them to join, and that picketing operations were instituted for the purpose of compelling plaintiff to coerce its employees and to obtain recognition of the union as the bargaining agent therefor. Defendants by answer denied that their conduct in the premises was unlawful, asserting that their purpose was to benefit union members and labor generally by the establishing of uniform conditions of employment throughout the territory in question. Defendants further asserted that the court lacked jurisdiction in the premises and that under the labor management relations act of 1947* exclusive jurisdiction was vested in the national labor relations board.

It is undisputed that the national labor relations board does not exercise the full measure of jurisdiction vested in it by the act of Congress. Prior to 1950 it declined to act in some cases, apparently on the theory that the carrying out of the purposes of the legislation did not require it to do so. In 1950 definite standards of jurisdiction were adopted, said standards being amended in 1954 in such manner as to materially enlarge the class of controversies in which jurisdiction would be rejected. It is not disputed in the case at bar that under the standards as adopted by the board jurisdiction would not be exercised thereby for the purpose of determining the matters in dispute between the parties hereto. As pointed out by the trial judge in his opinion, the plaintiff here was without remedy to prevent the injuries to its business of which it complained,

---

* 29 USCA, §§ 141–187.

if the courts of the State are without jurisdiction. Faced with this situation, the issue of jurisdiction was decided in plaintiff's favor.

After listening to the proofs the trial court concluded that defendants were guilty of the conduct charged against them, and that plaintiff was entitled to injunctive relief. The following excerpt from the opinion filed indicates the circuit judge's conclusions with reference to the factual situation:

"The results to the plaintiffs were disastrous to their small business. Receipts of and shipments by freight from trucking companies employing union men were cut off, as well as deliveries of other merchandise by union employees. Prospective customers turned away upon encountering the picket line. Plaintiffs' business was unfavorably advertised to the general public. Plaintiffs' business was substantially interfered with. Plaintiffs' business dropped off about 50% over the corresponding period for the previous year.

"Apparently this is a test case. If the defendants prevail in this proceeding they can compel the owners of small enterprises, having employees eligible to join defendant union, to require such employees to join defendant union. Defendant union covers many types of enterprises. Defendant Alsten testified that it covered trucking, fuel, bakeries, beer and soft drink distributors, wholesale fruits, shop employees, warehouse employees and clerical help employed. Particularly, by controlling trucking employees defendant union can throttle shipment of merchandise to and from practically all small legitimate enterprises. Defendant union is affiliated with the powerful National Teamsters Union, employing out-of-State counsel. The owners of small enterprises may be helpless to resist the demands of such an organization. The possibilities of the exercise of such dangerous potential power are almost without limit."

A decree was entered in accordance with the opinion filed, and defendants have appealed.

It should be noted that the decree of the trial court was entered August 1, 1956. Thereafter, and under date of March 25, 1957, the supreme court of the United States rendered its decisions in *Guss* v. *Utah Labor Relations Board,* 353 US 1 (77 S Ct 598, 1 Led2d 601); *Amalgamated Meat Cutters & Butcher Workmen of North America, Local No. 427, AFL,* v. *Fairlawn Meats, Inc.,* 353 US 20 (77 S Ct 604, 1 Led2d 613); and *San Diego Building Trades Council* v. *Garmon,* 353 US 26 (77 S Ct 607, 1 Led2d 618). These decisions are determinative of the issue in the case at bar. The supreme court, 2 justices dissenting, there held that the States may not act in matters concerning which the Congress has granted authority to the national labor relations board, unless such board has, by agreement, ceded to a State agency such jurisdiction, as is provided in section 10(a)* of the Federal act as amended by the Taft-Hartley act of 1947. There has been no such delegation of power to any agency of the State of Michigan, nor does it appear from the record before us that there has been such delegation in other States. Under the interpretation of the Federal act by the United States supreme court the courts of this State were, and are, without power to grant preventive relief in a case of the nature here involved, even though, under the standards as fixed by the national labor relations board, said board declines to exercise its authority. The situation thus created was referred to in the majority opinion in the *Guss Case, supra,* as follows (pp 10, 11):

"We are told by appellee that to deny the State jurisdiction here will create a vast no-man's-land, subject to regulation by no agency or court. We

---

* 29 USCA, § 160(a).

are told by appellant that to grant jurisdiction would produce confusion and conflicts with Federal policy. Unforunately, both may be right. We believe, however, that Congress has expressed its judgment in favor of uniformity. Since Congress' power in the area of commerce among the States is plenary, its judgment must be respected whatever policy objections there may be to creation of a no-man's-land.

"Congress is free to change the situation at will. In 1954 the senate committee on labor and public welfare recognized the existence of a no-man's-land and proposed an amendment which would have empowered State courts and agencies to act upon the national board's declination of jurisdiction. The national labor relations board can greatly reduce the area of the no-man's-land by reasserting its jurisdiction and, where States have brought their labor laws into conformity with Federal policy, by ceding jurisdiction under section 10(a)."

The language of the court, above quoted, seems to tacitly recognize the right of the national board to establish standards by which it will be governed in accepting or refusing jurisdiction of cases sought to be submitted to it. Like recognition has been extended in other cases. It does not appear that any challenge to the right of the board to adopt fixed standards of the character in question has been determined, or, in fact, made. As noted in the dissenting opinion in the above cited cases (p 14):

"Courts of appeals have approved the board's practice and none of the parties to the instant cases question it."

Conceivably any question in this regard may be resolved by following the procedure suggested by the recent decision of the supreme court of the United States in *Leedom* v. *Kyne,* 358 US 184 (79 S Ct 180, 3 Led2d 210). Of interest, also in this connection is *Office Employes International Union,*

*Local No. 11, AFL-CIO,* v. *National Labor Relations Board,* 353 US 313 (77 S Ct 799, 1 Led2d 846).

Under the holding of the United States supreme court in the 3 cases first above cited, which must be regarded as establishing the existing law applicable in the instant case, the conclusion necessarily follows that the trial court was without jurisdiction to enter the decree granting injunctive relief to the plaintiff. A like conclusion must, of course, follow in all cases as to which exclusive jurisdiction is granted by the act of Congress to the national labor relations board notwithstanding the fact that said board, for economic or other reasons, declines to act under the standards that it has established. The courts being barred from granting relief, the result is a "no-man's-land," thus presenting an anomalous situation. So long as such situation obtains, parties to a controversy of the nature here involved, in which the extent of the operations of the employer in interstate commerce prevents appeal to the national board, have no forum in which preventive relief against irreparable injury may be sought. Such limitation applies alike to employers and to employees and their representatives. As matters now stand it does not appear that the situation can be changed other than by action on the part of Congress or of the national labor relations board. An action in tort for damages may be permissible under proper circumstances. *United Construction Workers* v. *Laburnum Construction Corp.,* 347 US 656 (74 S Ct 833, 98 L ed 1025); *International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW-CIO)* v. *Russell,* 356 US 634 (78 S Ct 932, 2 Led2d 1030). It is obvious that such remedy may prove wholly inadequate in many instances. It may not be regarded as an equal alternative for preventive relief of the nature that

the trial court undertook to grant in the instant case.

For the reason indicated, we concur in reversal.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.