CROSS COMPANY *v.* UAW LOCAL NO. 155 (AFL-CIO).

1. INJUNCTION—PICKETING—CONTEMPT.

A trial judge who is faced with a demand for an immediate injunction, especially an *ex parte* restraining order against, or restrictive of, picketing for the purpose of maintaining the *status quo* must exercise extreme caution in view of the crippling effect such injunctions may have upon the enjoined party's rights, the frequent absence of a *status quo* to maintain, potential permanent benefit or harm to a legally undeserving litigant, the possibility of placing the court as an adherent of one side or the other and of possible necessity for self-correction of the court at the time of subsequent determination of vacation or belated grant, and the lack of a jury trial incident to judicial enforcement of obedience through summary contempt procedures.

2. SAME—JURISDICTION—ENFORCEMENT.

An injunction that has been issued by a court with jurisdiction to do so, whether it be providently or improvidently issued, must be obeyed and judicially enforced.

3. CONSTITUTIONAL LAW—FREEDOM OF SPEECH.

The essence of the freedom to speak is the freedom to speak while speech may yet be effective.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 4–6, 9–12] 28 Am Jur, Injunctions § 248.
  31 Am Jur, Labor §§ 513–519.
[2]  28 Am Jur, Injunctions §§ 323, 324.
[3]  11, 12 Am Jur, Constitutional Law §§ 319, 648.
[7]  31 Am Jur, Labor § 169.
[8]  31 Am Jur, Labor § 572.
  State court's power to enjoin picketing as affected by labor management relations act.  32 ALR2d 1026.
[13]  31 Am Jur, Labor § 281 *et seq.*
[14]  31 Am Jur, Labor §§ 591–593.
  12 Am Jur, Contempt §§ 28, 80.

4. INJUNCTION—EX PARTE RESTRAINING ORDER—PICKETING—POLICE PROTECTION.

A clearly persuasive showing of imminent and irreparable injury beyond the power of the regularly constituted police authorities of the community to control must be insisted upon by the judge from whom a temporary restraining order against picketing is sought in order to justify his exercise of the extraordinary power prior to such hearing as due process demands.

5. SAME—PICKETING—PLEADING—ABSENCE OF REFERENCE TO POLICE PROTECTION.

Bill for injunction against picketing which alleged various acts of lawlessness had taken place near entrance to struck plant, but which made no reference to the presence or absence of the police authorities of the community or the State or that they had refused to perform their clear legal duty to prevent such lawlessness or had proved incapable of doing so, failed to justify the issuance of an *ex parte* restraining order which restricted the conduct of the picketing.

6. COURTS—PICKETING.

Courts may properly be required to remain open 24 hours a day in order to accommodate the necessities of a situation involving the issuance of an *ex parte* restraining order against picketing.

7. CRIMINAL LAW—PICKETING—CONTEMPT.

Police officers may not disregard their duty to arrest lawbreakers wherever found, even in the vicinity of where picketing is conducted, on the basis that such lawbreakers would be punished through the contempt process.

8. LABOR RELATIONS—PICKETING—VIOLENCE—STATE COURTS—JURISDICTION.

State courts have jurisdiction to entertain suits for injunctive relief against picketing even though the basic controversy between the employer and employees or union is subject to the Federal labor management relations act, where there is violence, imminent threats to the public order, and physically coercive conduct occurring on the picket line (29 USC, § 151 *et seq.*).

9. INJUNCTION—PICKETING—JURISDICTION.

The circuit judge of a county in which a picket line at an employer's plant has had incidents of violence has jurisdiction to enter an *ex parte* temporary restraining order, a tem-

porary injunction, and a permanent injunction, whatever may be said of the wisdom of his exercise of such jurisdiction.

10. Same—Temporary Injunction—Picketing—Public Peace—Police Protection.

Issuance of temporary injunction restricting manner in which picketing might be conducted at plaintiff employer's plant *held*, not improper under record justifying the circuit judge's conclusion that violence threatened the public peace, that the police present could not control the situation, and that only by the issuance of a temporary injunction could public peace and safety be restored (CLS 1956, §§ 423.9f, 423.17).

11. Same—Picketing—Public Peace.

The injunction, which a circuit judge issues to restrict picketing where the police force is unable to cope with the violence involved in the situation and the judge rightfully concludes that law and order can be restored only by issuance and enforcement of an injunction, may be fashioned to protect both parties and the public generally in the pursuit of their lawful activities, since his primary concern is not the correlative rights and duties of the parties, but rather the right of the community, including the parties, to public peace and safety.

12. Same—Permanent Injunction—Picketing.

Permanent injunction which restricted picketing more than previously issued *ex parte* temporary restraining order and temporary injunction relative to the same plant, based upon subsequent acts of violence which the police present did not prevent and also involving obstruction of the entrance to the plaintiff's plant and public highway leading thereto *held*, to have been fully justified (CLS 1956, §§ 423.9f, 423.17).

13. Labor Relations—Union as Sole Bargaining Representative.

Cross-bill to compel plaintiff employer to bargain with defendant union as the sole bargaining agent for plaintiff's production and maintenance employees was properly dismissed, where the cross-bill failed to state any cause upon which relief could be granted, and the defendant union now has no such right as, since the dismissal of the cross-bill, the national labor relations board's order certifying defendant union as such representative has been vacated by a Federal court.

14. Contempt—Temporary Injunction—Leave to Appeal.

Application for leave to appeal contempt convictions for violation of temporary injunction against picketing is granted where, on appeal from orders issuing temporary restraining

order, temporary injunction, and permanent injunction against picketing plaintiff's plant, it is determined the circuit judge had jurisdiction over the subject matter of the suit and did not commit reversible error in issuing the temporary and permanent injunctions.

Appeal from Macomb; Noe (Alton H.), J. Submitted March 7, 1963. (Calendar No. 84, Docket No. 48,558.) Decided September 4, 1963.

Bill by The Cross Company, a Michigan corporation, against United Automobile, Aircraft and Agricultural Implement Workers of America, Local No. 155, affiliated with AFL-CIO, Russell Leach, its president, and various individuals in official capacities in union, to restrain illegal picketing in connection with labor dispute. Temporary injunctions issued. Cross-bill by defendant union to enjoin operations in plaintiff's plant until company bargains with union as exclusive representative of employees. Contempt proceedings in respect to violations of temporary injunctions resulted in adjudication that defendant union, defendant Leach and various officials and members of the union violated the latest injunction and were guilty of contempt of court, but with execution stayed. Cross-bill dismissed. Order entered granting permanent injunction. Defendants appeal. Affirmed, with grant of leave to appeal to those parties under sentence for contempt.

*Clark, Klein, Winter, Parsons & Prewitt* (*Robert C. Winter, H. William Butler* and *Douglas E. Peck,* of counsel), for plaintiff.

*Livingston, Ross & Van Lopik* (*Winston L. Livingston, Nancy Jean Van Lopik,* and *Bruce A. Miller,* of counsel), for defendants.

Souris, J.   The parties to this appeal have been locked in mortal combat for over a decade.[1]   For the defendant union, the goal sought is the right to represent production and maintenance employees of plaintiff, The Cross Company, a majority of whom defendant claimed (and plaintiff denied) were its members.   In April of 1957 the union won a representation election and was certified as collective bargaining representative for such Cross workers by the national labor relations board (NLRB).   A collective bargaining agreement was negotiated by the company and the union, signed in August of 1957 and expired in October of 1958.   A group of Cross employees petitioned the NLRB for a decertification election to determine whether a majority of employees in the bargaining unit desired the union to continue representing them.   Such an election was held late in 1958 and was won by the union.   Rejecting the company's and the petitioning employees' objections to the union's electioneering activities, the NLRB refused to invalidate the result of the decertification election and certified the union as the collective bargaining representative of the Cross employees.   *The Cross Company,* 123 NLRB 1503, June 4, 1959.   Notwithstanding the union's certification by the NLRB, the company refused to bargain with it.   Ultimately, on August 3, 1959, the union filed with the NLRB an unfair labor practice charge based upon the company's refusal to bargain[2]

---

[1] Proceedings related to the events out of which this appeal arises continue on other fronts.   See *The Cross Company,* 143 NLRB No 88, July 31, 1963 (1963 CCH NLRB § 12.517).

[2] The NLRB, after investigation of the charge entered an order requiring Cross to bargain with the union.   Cross appealed the agency's order to the circuit court of appeals (6th circuit) which, on February 2, 1961, vacated the union's certification as the collective bargaining representative of the Cross employees and denied enforcement of the board's challenged order.   *Cross Company* v. *NLRB* (1961), 286 F2d 799.   See, also, *Cross Company* v. *Leedom* (CCA 6, 1959), 271 F2d 247, a related proceeding.

and, in the early morning hours of the next day, struck the Cross plant, which is located in Fraser in Macomb county.

On the first day of the strike, August 4th, a verified bill of complaint, supported by 17 affidavits, was filed with the Macomb county circuit court shortly after 4 o'clock in the afternoon. Within one-half hour, *without notice* to the union or to its officers and members named as defendants, a temporary restraining order had been signed by the chancellor and filed with the court clerk enjoining defendants, the officers, agents and representatives of the union, and any other persons acting in behalf of defendants, from:

"(1) In any manner obstructing or interfering with the free ingress to or egress from plaintiff's plant in the city of Fraser, Macomb county, Michigan, on the part of the employees or customers of The Cross Company or others.

"(2) From in any manner hindering or preventing by unlawful threats or charges or by mass picketing or congregating in large numbers at the entrances or place of ingress or egress to The Cross Company premises in Fraser, Michigan, or on the public highways at or near the entrances thereof, in pursuit of their lawful work or employment by employees of The Cross Company. [*sic*]

"(3) Encouraging, inducing, calling, procuring, authorizing, inciting, carrying out or otherwise causing the employees of The Cross Company, or others, to engage in mass picketing or congregating in large numbers at the entrances to The Cross Company premises at Fraser, Michigan, or at or on the public highways at or near The Cross Company's premises.

"(4) From picketing the said plant with a total number of pickets exceeding 20 at any 1 time."

The allegations in the bill of complaint pertinent to the chancellor's issuance of the *ex parte* temporary restraining order are set forth in the margin.[3]

---

[3] "5. On the 4th day of August, A. D. 1959, at or about 6:30 a. m. in the morning of said date, said union incited, ordered, persuaded and conspired with many persons, to wit: 60 persons or thereabouts, only a few of whom (not to exceed 10) were recognized as being employees of The Cross Company to engage in mass picketing and defendants have incited and encouraged and have induced such persons singly and in concert to disobey the law and have caused said persons to congregate in large numbers at the place of ingress and egress to said plant located in Fraser, county of Macomb and State of Michigan; that said persons have congregated in large numbers and have in disorderly fashion interfered with and are continuing to interfere with the use of the public highway reserved and set aside for the public and have interfered with the use of the entrances to plaintiff's plant by persons having a lawful right to be thereon and by persons seeking to enter upon or leave the premises of plaintiff.

"6. Said defendants have engaged in and have conspired with other persons whose names are not known but whose persons are well known to cause large numbers of persons in excess of 50 or more to mass, congregate, obstruct and otherwise interfere with plaintiff in the lawful operation of its business and to interfere with the streets and passageways located in, on or about the premises of plaintiff and have through said massing and collecting and congregating together intimidated, interfered with and prevented the lawful use of said streets and thoroughfares.

"7. The plant of plaintiff is located in a completely fenced area at the northwest corner of the intersection of the Grand Trunk Railroad and Fourteen Mile road in Fraser, Michigan. The plant entrance is a 2-lane road through the fence leading from Fourteen Mile road, which is a 2-lane public highway and is heavily traveled. The congregation of said persons as aforesaid at the plant gate has created a dangerous situation and the said persons have been incited by defendants acting singly and in concert and have become disorderly and defendants through their illegal and improper action have created a possibility of riot and civil unrest and have engaged and are continuing to engage in acts which constitute a breach of the peace. Plaintiff is well informed and verily believes that among the acts committed by the defendants and the pickets and other persons incited by them have been the following:

"(a) Upwards of 50 persons have massed closely together across the entrance making passage through the gate impossible.

"(b) The pickets have told persons that no one could go into the plant today and that they would prevent any person from entering the plant.

"(c) The pickets have forcibly opened the car door of a person desiring to enter the plant gate and without permission pulled the keys from the ignition switch of the car, and have opened car doors and attempted to pull the driver out, swinging at him, throwing picket signs and milk bottles at the cars.

"(d) The pickets have reached into the car of 1 person, Ralph E. Cross, as if to strike him as he attempted to drive through the

Three days later, following conferences between the chancellor and the parties and a hearing in open court on the order to show cause issued with the temporary restraining order, the chancellor vacated the restraining order saying, in doing so, that he was relying upon the sheriff's assurances to him that with the union's cooperation the sheriff could control the situation and upon the union's assurance made by its counsel in open court that there would be no mass picketing, that it would obey the law, that it would do all in its power to prevent violence, and that counsel for the union would reappear in court upon 2-hours' notice in the event a recurrence of violence required further injunctive action.

On August 13th, less than a week later, plaintiff moved the court for such injunctive relief, claiming that defendants had again interfered with ingress

plant gate, causing him to duck his head and knock his hat off, rocking and hitting his car.

"(e) The pickets, 1 or more of them, have stepped in front of cars attempting to drive through the plant gate.

"(f) The pickets have jammed traffic on Fourteen Mile road.

"(g) The pickets have crossed back and forth between the plant gate and a housetrailer parked across Fourteen Mile road opposite the gate, frequently creating a traffic hazard.

"(h) The pickets have damaged automobiles seeking entrance at the gate by pounding the cars, breaking off rear-view mirrors, breaking door windows, pelted and rocked cars, and have poked sticks carrying picket signs in the face of a driver of a car seeking entrance to the plant, all of which more particularly and in greater detail appears by the affidavits hereto attached and made a part hereof.

"8. This court, by virtue of its jurisdiction over the highway and thoroughfares and by virtue of its jurisdiction to maintain the public order, has jurisdiction over this cause.

"9. Said acts of mass picketing, threats and intimidation are illegal, contrary to the rights of this plaintiff and are in no way licensed by law, but on the contrary constitute a violation of the law and interference of the lawful rights of plaintiff to engage in the operation of its business.

"10. The plaintiff does not have an adequate remedy at law and that there is no other remedy available to the plaintiff by Federal or State law against the unlawful acts of defendants and that by reason of the absence of adequate remedy the plaintiff will suffer an irreparable damage unless granted relief in a court of equity and that the amount involved in this controversy greatly exceeds the jurisdictional amount of $100."

to and egress from its plant, had again engaged in mass picketing and congregated in large numbers at the entrance to the plant, and had again made unlawful threats and charges to its working employees. This motion was supported by 15 affidavits relating events which allegedly occurred subsequent to vacation of the *ex parte* restraining order. Testimony was taken in support of plaintiff's motion during 3 court days and resulted in the issuance of a temporary injunction on August 19th in terms identical with the previously vacated *ex parte* restraining order (set forth above), but with the addition of the following clause to paragraph 4 and new paragraph 5:

"and shall at all times leave unobstructed a passageway through the company gate at least 10 feet in width." (Added to paragraph 4.)

"(5) From by force or unlawful threats to force or attempt to force any person to refrain from engaging in employment at The Cross Company at its plant on Fourteen Mile road in Fraser, Michigan."[4]

On September 2nd, 17th, and 21st a total of 4 petitions for adjudication of contempt for violation of the temporary injunction, each supported by numerous additional affidavits, were filed by plaintiff against the union, certain of the named individual defendants and others. Orders to show cause were issued and served upon the alleged contemners and, after preliminary motions to dismiss the petitions and to strike their supporting affidavits had been

---

[4] On October 7th the temporary injunction was modified to prohibit picketing the plant "in any manner whatsoever" by more than 10 pickets at any time, to require maintenance of an unobstructed passageway through the plant gate at least 16 feet in width, and the following new provisions were added:

"(6) From inducing or encouraging others to do any of the acts herein enjoined.

"(7) From congregating or assembling on the north or south side of or in the 120 feet width of Fourteen Mile road in the vicinity of the entrance to the factory of The Cross Company with any more than 20 people."

denied, testimony was taken intermittently on the contempt citations commencing on September 24th and ending October 30th. The chancellor found the union and several of its officers and members guilty of contempt of court and imposed jail sentences and fines upon them.

In the meantime, on September 21st, defendants had filed their answer to the bill of complaint and, in addition, had filed a cross-bill praying that plaintiff be enjoined from continuing to operate its plant until it bargained with defendant union or until vacation of the union's certification by the NLRB as the exclusive bargaining representative for plaintiff's employees. The cross-bill was dismissed on October 27th, on plaintiff's motion based principally upon the claim that the NLRB had exclusive jurisdiction to entertain matters such as were alleged in the cross-bill.

At the conclusion of the contempt hearings, the parties stipulated that the evidentiary record made at those hearings could be regarded by the chancellor as the record on the merits of the issues framed by the bill of complaint and defendant's answer. The chancellor thereupon issued a permanent injunction identical to the amended temporary injunction previously issued excepting only that the 16-foot unobstructed passageway into the plant required to be maintained by paragraph 4 of the amended temporary injunction was increased to 20 feet and the clause "with any more than 20 people" appearing at the end of paragraph 7 of the amended temporary injunction was omitted from the permanent injunction.

This appeal was thereupon taken as of right to review the chancellor's actions in issuing the temporary and permanent injunctions. There is presently pending in this Court an application for leave to appeal the convictions for contempt, determination

of which this Court has stayed pending our appellate disposition of the principal case.

It is not often this Court, or any court, is called upon to review the final act in injunctive proceedings involving labor-management controversies. The trial courtroom is often the first public battleground in such controversies. Depending upon whether and how the court acts, it may also be the last. The number of labor disputes *finally* resolved by an ostensibly "temporary" basis are legion. Indeed, appellate review of such cases usually occurs, if it occurs at all, upon the issuance or denial of such "temporary" orders, thereby demonstrating the devastating effect such orders, or their denial, have upon the rights of the parties.[5] And the labor cases which ultimately are dismissed before trial or go down on the "no progress" docket are mute evidence that the crucial legal battles in labor-management disputes generally are those that first occur.

Thus it is that the chancellor confronted with a classic demand for an injunction against, or restrictive of, picketing must be aware that the judicially appealing request for "mere maintenance of the *status quo*" presents an awesome *judicial* task,—not the assumption of executive department obligations, —fraught with potentially permanent benefit or harm to a legally undeserving litigant. First, often there is no *status quo* to maintain in such fluid and dynamic relationships and, so, *any* judicial act of grant or forbearance of injunctive relief inevitably results in the voluntary or involuntary servitude of the court as an adherent of one side or of the other,— at least in the minds of the parties directly involved

---

[5] See *Booth Broadcasting Company* v. *American Federation of Television and Radio Artists*, 366 Mich 559, where this Court stayed enforcement of a temporary injunction against peaceful picketing, granted without the benefit of a testimonial record and following issuance of an *ex parte* temporary restraining order, upon grant of leave to appeal therefrom,—in recognition of the crippling effect such injunctions have upon the enjoined party's rights.

and also in the minds of the public before whom, and sometimes for whose support, the picket line battle is being waged. Second,—and certainly not unrelated to the first,—once temporary injunctive relief in labor disputes has been granted or refused with or without adversary hearing, at the time of subsequent determination of vacation or belated grant the moving party faces a chancellor he must move to self-correction. Third, no judicial officer should ever exercise, without the most careful reflective thought, the ominous power of injunction which commands obedience by withdrawal of traditional judicial safeguards of jury trial and substitution of summary contempt procedures, for once having issued, *assuming jurisdictional right,* such injunctions whether providently or improvidently issued must be obeyed and judicially enforced. See *Town & Country Motors, Inc.,* v. *Local Union,* 355 Mich 26, beginning at p 48 and particularly the cases cited at p 55. See, also, *In re Green* (1962), 369 US 689 (82 S Ct 1114, 8 L ed 2d 198); *John F. Jelke Co.* v. *Hill* (1932), 208 Wis 650 (242 NW 576); and *Rose* v. *Aaron,* 345 Mich 613.

Whenever the chancellor's power to enjoin is invoked upon *ex parte* demand, all of the foregoing considerations assume overwhelming importance.[6]

---

[6] Frankfurter and Greene, in *The Labor Injunction,* at pp 200, 201, as quoted in *Town & Country Motors, Inc.,* v. *Local Union,* 355 Mich 26, 50, 51, describe the evils of the labor injunction in terms of "legal maladjustment." Further amplification of the abuses which labor injunctions have served appears in *Town & Country Motors, Inc.,* at pp 51, 52:

"Prominent among the abuses was the common inclusion of injunctive language construed to forbid labor's publicizing what it regarded as the essential facts concerning the controversy by means of the placards of the picket line and the dissemination of leaflets therefrom. Constitutional difficulties of the most serious nature (*cf., Thornhill* v. *Alabama,* 310 US 88 [60 S Ct 736, 84 L ed 1093]) cluster around the employment of a court's injunctive process in derogation of our basic freedoms. The denial to labor, in the pursuit of its legitimate objectives, of freedom to acquaint the public at large of its side of the controversy is no less a denial of free speech because the notification may, as well, exert an economic compulsion

This is one of the rare occasions in the law when our revered concepts of due process give way to practical necessities of life. A chancellor faced with such demand, *assuming jurisdiction over the subject matter,* must make his decision, and quickly at that, relying solely upon the representations of an ·adversary who, presumptively believing he lacks any other legal or equitable remedy, seeks injunctive relief *ex parte.* When such demand is made in the usually volatile setting of a labor-management dispute, a superabundance of caution and perceptive cynicism should be carried by the chancellor to his Bench. The powers of observation, recollection, and description of a hard-pressed adversary in such circumstances cannot be otherwise uncritically ac-

---

upon the listener. To say that a 'temporary' order restraining the exercise of a basic constitutional right is harmless to the existence and exercise of the right because the interference is only temporary is to substitute a shabby formula for a basic freedom. With obedience to the 'temporary' injunction, under pain of contempt, the basic right is lost. It is the utterance of the protest of oppression that is intended to quicken the conscience of the community. If we still the tongue at the moment of need we may as well tear it out. The word that is heeded is the word wrung out of the very crisis itself, not the murmurings of reproach after the battle is lost. The essence of the freedom to speak is the freedom to speak while speech may yet be effective."

In the same year of decision (1959) in the case of *Town & Country Motors,* we decided *Davidson* v. *Michigan State Carpenters Council,* 356 Mich 557, in which the Court observed, at p 565:

"The fact that such an injunction is issued *ex parte* means, in simplest terms, that the court employs its awesome process at the behest of only one of the parties to a controversy in such a way as to make the final decision, for all practical purposes, a nullity. Its employment in the strike cases involves the distortion of a simple judicial tool of great antiquity, the injunction, to a perverted use as an instrument of economic policy affecting the lives of thousands. The policy so enunciated is that of a single judge, based upon little or no showing as to the economic and social factors involved. The edict thus enunciated is interpreted, then, by him alone, and enforced through the process of civil and criminal contempt, without the interposition of the traditional safeguards of a jury. Our people have a very limited degree of tolerance for such agglutinations of power, whether wielded by the wearer of crown or robe. The esteem in which courts are held, and our people's respect for the law as an instrument of government were placed in jeopardy by such judicial acts, economically ill-considered, and, in respect of the injunction *ex parte,* both precipitate and one-sided."

cepted (or, indeed, rejected) without risk of grave damage to 1 of the adversaries or to the public. In labor cases, where picketing is sought thus to be enjoined or restricted summarily, nothing less than a clearly persuasive showing of imminent and irreparable injury beyond the power of the regularly constituted police authorities of the community to control must be insisted upon by the chancellor to justify his exercise of the extraordinary power of injunction *prior to such hearing as due process demands.* Compare the policy declared by Congress in the Norris-LaGuardia Act (29 USC, § 107) which prohibits Federal courts from granting *ex parte* injunctive relief in such cases except upon sworn testimony that police officials are unable or unwilling to furnish adequate protection to complainant.[7]

---

[7] 29 USC, § 107, provides, in pertinent part:

"No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect—

"(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

"(b) That substantial and irreparable injury to complainant's property will follow;

"(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

"(d) That complainant has no adequate remedy at law; and

"(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

"Such hearing shall be held after due and personal notice thereof has been given, in such manner as the court shall direct, to all known persons against whom relief is sought, and also to the chief of those public officials of the county and city within which the unlawful acts have been threatened or committed charged with the

Measured by such standard, this record fails to justify what was first here done. Reference to the critical paragraphs of plaintiff's bill of complaint, set forth above in footnote 3, discloses allegations of a reprehensible situation of lawlessness involving breaches of both private and public right. However, the bill of complaint makes no reference to the presence or absence of the police authorities (although 1 of the bill's supporting affidavits refers to the presence at the plant gate of "several Fraser police") nor is there any showing, by affidavit or even by bare allegation, that the police power of the community and State had refused to perform its clear legal duty to prevent such lawlessness or had proved incapable of doing so. Nonetheless, an *ex parte* temporary restraining order was issued within 1/2 hour of the filing of the bill of complaint without, as far as this record discloses, any effort by the chancellor to determine the adequacy of executive powers to deal with the situation portrayed by the bill.

Nor does the record even suggest why the order was issued without the chancellor's requiring that notice be given to defendants directly or through defendant union's counsel, whose identity was known to plaintiff by virtue of prior and contemporaneous legal proceedings involving the company and union. Plaintiff's first knowledge of the defendants' activities was at 6:30 a. m. of the day the order was issued; yet, while preparing a bill of complaint consisting of detailed allegations of mass picketing and other violations of law by violence and otherwise and sup-

---

duty to protect complainant's property: *Provided, however,* That if a complainant shall also allege that, unless a temporary restraining order shall be issued without notice, a substantial and irreparable injury to complainant's property will be unavoidable, such a temporary restraining order may be issued upon testimony under oath, sufficient, if sustained, to justify the court in issuing a temporary injunction upon a hearing after notice."

porting such bill by 17 affidavits, no notice was given to defendants that the bill would be filed late that afternoon and a temporary restraining order would be sought based thereon. As a matter of fact, the bill was filed and the temporary restraining order issued shortly after the time of plaintiff's normal afternoon shift-break,—too late to be effectual at the next potentially troublesome period following the morning's violent activities, but sufficiently before the next potentially explosive shift-break to accord defendants at least a few hours' notice and an opportunity to be heard before the majesty of the court's injunction with its stern process of contempt was enlisted against them. Conceivably, just possibly, the temporary restraining order may not have issued had defendants been able to convince the chancellor that peace had been restored and would be maintained (as indeed was done 3 days later, resulting in vacation of the order); but more probably, defendants might have persuaded the chancellor that the terms of the injunctive order should have been other than they were; or, perhaps even that its injunctive provisions should apply to both sides of the controversy. The point is that no chancellor should permit himself, and the court's process, to be impressed to arms on 1 side of such battle *without first determining the meritorious claims of the other side* absent, at the very least, a compelling showing that police protection against violence and physically coercive conduct threatening the public peace is unavailable or ineffectual. Lest it be whispered that the bill was filed so late in the afternoon that no time remained in the judicial day for the niceties of due notice and hearing, we may remind bench and bar that in cases of extreme emergency, as we must presume the chancellor and plaintiff considered was here involved to justify the *ex parte* injunctive relief granted, judicial doors like

the proverbial gates of hell are open 24 hours a day.

What effect issuance of the restraining order without prior notice or hearing had upon subsequent events we cannot say. Viewing the history of this controversy with our customary advantage of hindsight, we may surmise that police authorities, local, county, and State, could have been (and therefore should have been) galvanized to performance of their sworn duty to apprehend, detain and convict lawbreakers (on both sides of the picket fence) by the normal process of the criminal law with all its constitutional procedural safeguards without necessity for precipitous *ex parte* imposition of the crushing weight of the court's injunction on only 1 side of the controversy.[8]

The fact is, however, that the *ex parte* restraining order was issued, and then set aside, but soon thereafter reinstated in more rigidly restrictive form as a temporary injunction following a protracted hearing at which a complete testimonial record was made. It is for the subsequent violations of this temporary injunction some of the defendants and others have been convicted and sentenced for contempt and from which convictions their application for leave to appeal is pending before this Court.

On this appeal defendants challenge the jurisdiction of the chancellor to entertain the suit, claiming its subject matter has been pre-empted by congress

---

[8] The record shows that virtually no arrests were made during the entire course of this admittedly violent strike notwithstanding the *ex parte* temporary restraining order and the temporary injunction. It can be argued that this fact demonstrates the ineffectiveness of the regularly constituted police authorities to control the lawlessness which occurred. On the other hand, it is far more likely that the police officers looked practically upon the affray as an essentially private one in which the violated company had more than ample redress by virtue of its right to demand judicial enforcement of the chancellor's injunctive orders by contempt proceedings. We do not, of course, condone such cavalier regard for duty. The proper course would have been for the officers to arrest lawbreakers wherever found, injunction or no injunction, leaving to others the decision whether regular criminal or contempt processes should follow.

for the NLRB. Labor management relations act
of 1947, as amended, 29 USC, § 151 *et seq.* Defend-
ants argue that in the second *Garmon Case, San
Diego Building Trades Council* v. *Garmon* (1959),
359 US 236 (79 S Ct 773, 3 L ed 2d 775), the United
States supreme court embraced within this applica-
tion of the pre-emption rule all strike or picket
line activity, even involving violence and imminent
threats to the public peace, if such activity also argu-
ably constitutes an unfair labor practice under sec-
tion 8 of the labor management relations act. If
defendants are right in this contention, then the
chancellor lacked jurisdiction over the subject mat-
ter of this suit and his injunctions were and are
invalid, thereby relieving those of them convicted
of contempt from such judicial finding. We do not
read the supreme court's majority opinion as do
defendants.[9] Mr. Justice Frankfurter, writing for
the majority, carefully preserved intact the supreme
court's prior holdings in *Youngdahl* v. *Rainfair, Inc.,*
355 US 131 (78 S Ct 206, 2 L ed 2d 151), and *United
Automobile Workers* v. *Wisconsin Employment
Relations Board,* 351 US 266 (76 S Ct 794, 100 L ed
1162), in both of which the supreme court sustained
State court injunctions against violence and physi-
cally coercive conduct occurring on picket lines.
Justice Frankfurter's opinion in *Garmon,* 359 US
at 243, 244, and 247, clearly acknowledged the States'
continuing jurisdiction in such cases and stated the
reasons therefor:

"However, due regard for the presuppositions of
our embracing Federal system, including the prin-
ciple of diffusion of power not as a matter of doc-
trinaire localism but as a promoter of democracy,

---

[9] Nor, apparently, does the supreme court. See *Local 100 of the
United Association of Journeymen & Apprentices* [*Plumbers*] v.
*Borden* (June 3, 1963), 373 US 690, 693, 694 (83 S Ct 1423, 1425,
10 L ed 2d 638, 641).

has required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the labor management relations act. See *International Association of Machinists* v. *Gonzales,* 356 US 617 (78 S Ct 923, 2 L ed 2d 1018). Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that congress had deprived the States of the power to act. * * *

"It is true that we have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. *United Automobile Workers* v. *Russell,* 356 US 634 (78 S Ct 932, 2 L ed 2d 1030); *United Construction Workers* v. *Laburnum Corp.,* 347 US 656 (74 S Ct 833, 98 L ed 1025). We have also allowed the States to enjoin such conduct. *Youngdahl* v. *Rainfair, Inc.,* 355 US 131 (78 S Ct 206, 2 L ed 2d 151); *United Automobile Workers* v. *Wisconsin Employment Relations Board,* 351 US 266 (76 S Ct 794, 100 L ed 1162). State jurisdiction has prevailed in these situations because the compelling State interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction."

There is no validity to defendants' claim that in the face of violence constituting even breaches of the public peace, or threats of imminent violence, the State must stand by helplessly while a Federal administrative agency determines whether or not to seek a Federal judicial remedy. At least while *Youngdahl* v. *Rainfair* and *United Automobile Workers* v. *Wisconsin Employment Relations Board* are still the land's law, Michigan's courts retain jurisdiction "in the most elementary sense", as said in *Town & Country Motors, Inc.,* v. *Local Union,* 355

Mich 26, at p 54, to entertain suits for injunctive relief against such conduct and, on a proper record, to issue valid injunctive orders.

We have heretofore indicated that the temporary restraining order issued *ex parte* may have been improvident, but *jurisdiction* to enter the order the chancellor had, whatever might be said of the judicial wisdom of its exercise.   The chancellor's *jurisdiction* to issue the subsequent temporary and permanent injunctions stands on the same footing. There remains only determination whether the testimonial record made supports the chancellor's decision to exercise that jurisdiction by issuance of the injunctions.

The temporary injunction was issued after hearings held on August 14th, 18th, and 19th.   The plaintiff presented 17 witnesses who testified about events occurring at the scene of the strike following vacation of the temporary restraining order.   The defendants offered no proofs of their own.   In granting plaintiff's motion for a temporary injunction, the chancellor referred to our statutory provisions making it unlawful for any person to obstruct or interfere with ingress to or egress from any place of employment[10] and concluded from the evidence

---

[10] CLS 1956, § 423.9f (Stat Ann 1960 Rev § 17.454[10.5]), provides:

"It shall be unlawful (1) for any person or persons to hinder or prevent by mass picketing, unlawful threats or force the pursuit of any lawful work or employment, (2) to obstruct or interfere with entrance to or egress from any place of employment, (3) to obstruct or interfere with free and uninterrupted use of public roads, streets, highways, railways, airports, or other ways of travel or conveyance, or (4) to engage in picketing a private residence by any means or methods whatever: Provided, That picketing to the extent that the same is authorized under constitutional provisions, shall in no manner be prohibited.   Violation of this section shall be a misdemeanor and punishable as such."

See, also, CLS 1956, § 423.17 (Stat Ann 1960 Rev § 17.454[18]), which provides:

"It shall be unlawful (1) for any employee or other person by force or unlawful threats to force, or attempt to force any person to become or remain a member of a labor organization, or (2) for

offered at the hearing that the acts of violence and massing of pickets at the plaintiff's plant were intended to, and did, frighten and intimidate nonstriking employees of Cross from engaging in their lawful employment and obstructed and interfered with ingress to and egress from the plaintiff's plant. Defendants do not deny that during the interim period following vacation of the *ex parte* restraining order, automobile windshields were broken, paint solvent was thrown upon the body of a car entering the plant, other cars were stoned and paint splattered upon their bodies. Indeed, the testimonial record establishes these acts of violence and substantially more, such as spitting upon cars and occupants, pounding, rocking, and scratching of cars entering the plant, forceful removal of accessories from cars crossing the picket line, and obstruction of the only driveway from the public highway to plaintiff's property by pickets. One of plaintiff's witnesses testified he was struck on the back of the head by a picket sign while driving out of the plant and another testified that a picket reached into his car and grabbed him by his throat and then by his coat in an effort to drag him out of the car as he was leaving the plant. There was also an abundance of testimony of vile and obscene epithets directed by the pickets and their supporters at nonstriking Cross employees and the policemen on duty at the strike scene.

There is nothing in this record to explain the failure of the local police authorities to maintain law and order in the vicinity of the plaintiff's plant. During much of the time events of violence occurred, according to the testimony, there were police officers

---

an employee or other person by force or unlawful threats to force or attempt to force any person to refrain from engaging in employment. Violation of this section shall be a misdemeanor and punishable as such."

present (although the record indicates there were never more than 6 or 7 police officers present in the area at any one time) yet, as we have observed earlier in this opinion, few arrests were made. The chancellor commented, and his comment finds support in the record, that the police officers were engaged in pushing people out of the way so that cars could enter and leave the plaintiff's plant. We may infer properly from this record that the police force on duty at the strike scene was inadequate to effect immediate arrest of persons violating the law, but the record is silent as to the effort made, if any, to obtain sufficient police personnel to maintain law and order. As much as we regret the involvement of the judiciary by injunctive process in matters of this kind, absent a persuasive showing that all other legal remedies have been exhausted, we are not persuaded that issuance of the temporary injunction was clearly erroneous. From the record made before him, the chancellor properly could conclude only that violence threatened the public peace, that the police could not control the situation, and that only by issuance of a temporary injunction could public peace and safety be restored.

Defendants argue that the injunction should not have issued against them, notwithstanding the record of violence made at the hearing, because very few of the plaintiff's witnesses identified their antagonists as striking Cross workers or officials of defendant union and because the evidence disclosed the presence at the strike scene of large numbers of people, some from other local unions, over whom defendants denied they exercised any control. Whatever bearing these circumstances may have upon the responsibility of the defendant union and its officers for alleged violations of the injunction in the subsequent contempt proceedings, they are not relevant to a chancellor's determination that law

and order can be restored and maintained at a strike scene only by issuance and enforcement of an injunction. At this stage in the judicial proceedings, ideally at least, the chancellor's primary concern is not the correlative rights and duties of the parties, but rather the right of the community, including the parties, to public peace and safety. To that end, the chancellor is fully empowered to fashion his injunctive order to protect not only 1 party to the controversy, but to protect both parties and the public generally in the pursuit of their *lawful* activities.

The evidence received during the contempt hearings, by stipulation considered by the chancellor as the record made at a hearing on the merits, conclusively shows that acts of violence continued intermittently after issuance of the temporary injunction and that on 2 separate occasions in September of 1959 mass picketing resulted in a situation approaching mob rule. On September 15th the mob was so unruly that it overturned an automobile, injuring 1 of its 6 occupants, and then turned back the wrecker called to the scene and interfered with the progress of an ambulance called to remove the injured occupant. Another car was stoned and hit by a "paint bomb", its windows broken and its driver's face cut by glass or other objects. For several hours no one was permitted to enter plaintiff's plant. On September 18th, another mob scene developed during which, this time, police barred all traffic on the public highway leading past the plant thereby precluding admission to the plant until the mob dispersed. It was estimated that between 800 and 1,000 people congregated within the area. In addition to testimony of violence during September 15th and 18th, plaintiff's witnesses testified about other events of violence and intimidation occurring on other days. It would serve no useful purpose to

detail that testimony. It was of the same nature
as that which preceded issuance of the temporary
injunction and fully justified the chancellor in issu-
ance of a permanent injunction.

Defendants' cross-bill of complaint, dismissed on
plaintiff's motion before trial, alleged generally that
plaintiff's refusal to bargain with the union "pro-
longed and aggravated" the strike and that such
refusal induced large numbers of people unknown
to defendants to congregate near the plant and to
engage in "horseplay, misconduct, and other dis-
orderly conduct" causing great unrest seriously
impeding defendants' peaceful and orderly strike.
It also alleged that the company threatened loyal
union members with dismissal from employment;
assisted a minority group of employees to seek
NLRB decertification of the union; furnished free
food, lodging, entertainment and other benefits to
employees who did not support the strike; spied on
defendants' picket line with cameras, telescopes and
personal surveillance; offered employment and in-
creased wages and other benefits to employees re-
turning to work; and incited its plant guards and
others to assault pickets, all of which actions defend-
ants alleged "prolonged and aggravated the strike
and thereby generated public unrest and breaches
of the peace and other misconduct." Defendants
prayed for an injunction restraining the company
from operating its plant until it bargained with
defendant union or until the union's certification as
the exclusive bargaining representative of the com-
pany's production and maintenance employees was
set aside by the NLRB.

The cross-bill's sole thrust was to compel The
Cross Company to bargain with the union, a right
to which it is no longer entitled (let alone by order
of a State court) in view of the subsequent judicial
vacation (*The Cross Company* v. *NLRB* (CCA 6,

1961], 286 F2d 799) of the NLRB's certification of the union as exclusive bargaining representative. Aside from that, however, the cross-bill's allegations fail to state any cause upon which the chancellor could grant relief. Its dismissal, therefore, is affirmed.

Having concluded that the chancellor had jurisdiction over the subject matter of this suit and that he did not commit reversible error in issuing the temporary and permanent injunctions, we have reviewed defendants' application for leave to appeal the contempt convictions for violation of the temporary injunction and have concluded that leave to appeal should be granted. The parties need not file new appendices in that appeal if they believe the appendices filed in this appeal are adequate for their purposes.

Affirmed. Costs to plaintiff.

KELLY, BLACK, KAVANAGH, SMITH, and O'HARA, JJ., concurred with SOURIS, J.

CARR, C. J., and DETHMERS, J., concurred in the result.